**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| NICHOLAS PARKS, Individually and for Others Similarly Situated<br><br>v.<br><br>CHESAPEAKE HOSPITAL AUTHORITY t/a CHESAPEAKE REGIONAL HEALTHCARE | **Case No. __________________**<br><br>Jury Trial Demanded<br><br>FLSA Collective Action<br>Rule 23 Class Action |

# ORIGINAL CLASS AND COLLECTIVE ACTION COMPLAINT

## SUMMARY

1. Nicholas Parks (Parks) brings this class and collective action to recover unpaid wages and other damages from Chesapeake Hospital Authority t/a Chesapeake Regional Healthcare (Chesapeake).

2. Parks worked for Chesapeake in Virginia.

3. Parks and the other Patient Care Employees (defined below) regularly work more than 40 hours in a week.

4. Chesapeake pays Parks and the other Patient Care Employees by the hour.

5. But Chesapeake does not pay them for all hours worked.

6. Instead, Chesapeake automatically deducts 30 minutes a day from these employees' hours for so called "meal periods" (Chesapeake's "auto-deduction policy")

7. Parks and the other Patient Care Employees are thus not paid for this time.

8. But Parks and the other Patient Care Employees do not actually receive *bona fide* meal breaks.

9. Instead, Chesapeake requires Parks and the other Patient Care Employees to remain on duty and perform compensable work throughout their shifts, including during so called "meal periods," and subjects them to work interruptions during their "meal periods."

10. Additionally, Chesapeake requires the Patient Care Employees to clock in and out for their shifts via its timekeeping system, but Chesapeake automatically rounds their clock in and clock out punches to the nearest quarter hour for its own primary benefit (Chesapeake's "rounding policy").

11. Finally, Chesapeake pays Parks and the other Patient Care Employees non-discretionary bonuses, including sign on bonuses, that it fails to include in their regular rates of pay for the purpose of calculating their overtime rates of pay (Chesapeake's "bonus pay scheme").

12. Chesapeake's auto-deduction policy, rounding policy, and bonus pay scheme violate the Virginia Overtime Wage Act (VOWA) and Fair Labor Standards Act (FLSA) by depriving Parks and the other Patient Care Employees of wages, including overtime wages at the required rate for all overtime hours worked.

13. Likewise, Chesapeake's auto-deduction policy and rounding policy violate the Virginia Wage Payment Act (VWPA) by depriving Parks and the other Patient Care Employees of earned wages at their agreed hourly rates for all hours worked.

## Jurisdiction & Venue

14. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

15. This Court also has supplemental jurisdiction over the state-law subclass claims because these claims arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

16. This Court has general personal jurisdiction over Chesapeake because Chesapeake maintains its principal place of business in Virginia.

17. Venue is proper because Chesapeake maintains its principal place of business in Newport News, Virginia, which is in this District and Division. 28 U.S.C. § 1391(b)(1).

## PARTIES

18. Parks worked for Chesapeake as a registered nurse (RN) from approximately June 2023 until June 2024.

19. Throughout his employment, Chesapeake classified Parks as non-exempt and paid him by the hour.

20. Throughout his employment, Chesapeake subjected Parks to its auto-deduction policy, rounding policy, and bonus pay scheme.

21. Parks brings this action on behalf of himself and other similarly situated Chesapeake employees subject to Chesapeake's auto-deduction policy, rounding policy, and/or bonus pay scheme.

22. The putative FLSA collective of similarly situated employees is defined as:

> **All hourly Chesapeake employees who worked under Chesapeake's auto-deduction policy, rounding policy, and/or bonus pay scheme during the past 3 years through final resolution of this action ("FLSA Collective Members").**

23. The putative Virginia class of similarly situated employees is defined as:

> **All hourly Chesapeake employees who worked in Virginia under Chesapeake's auto-deduction policy, rounding policy, and/or bonus pay scheme during the past 3 years through final resolution of this action ("Virginia Class Members").**

24. The FLSA Collective Members and Virginia Class Members are collectively referred to as the "Patient Care Employees."

25. Chesapeake is a Virginia hospital authority and maintains its principal place of business in Chesapeake, Virginia.

26. Chesapeake may be served with process by serving its directors, commissioners, chief administrative officers, attorneys, or any member of its governing body at its principal address: **736 Battlefield Boulevard North, Chesapeake, Virginia 23320**.

## COVERAGE UNDER THE FLSA

27. At all relevant times, Chesapeake was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

28. At all relevant times, Chesapeake was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

29. At all relevant times, Chesapeake was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, computers, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

30. At all relevant times, Chesapeake had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

31. At all relevant times, Parks and the other Patient Care Employees were Chesapeake's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

32. At all relevant times, Parks and the other Patient Care Employees were engaged in commerce or in the production of goods for commerce.

## FACTS

33. Chesapeake touts itself as "a health system laser-focused on innovation, known for making medical history in the region" with "over 40 practice locations."[1]

---

[1] https://chesapeakeregional.com/about-us (last visited September 2, 2025).

34. Chesapeake advertises open jobs across its system and solicits applications through its website.[2]

35. To meet its business objectives, Chesapeake hires workers, including Parks and the other Patient Care Employees, to work in its hospitals and clinics.

36. Chesapeake maintains control, oversight, and direction of Parks and the Patient Care Employees, including, but not limited to, hiring, firing, disciplining, and other employment practices, regardless of the specific Chesapeake facility they are assigned.

37. Chesapeake requires Parks and the Patient Care Employees to follow its uniform policies and procedures regardless of facility.

38. Parks' and the Patient Care Employees' work must strictly adhere to the uniform quality and safety standards put in place by Chesapeake.

39. Chesapeake supervises and controls Parks' and the Patient Care Employees' work and prohibits these employees from straying from its uniform procedures, plans, protocols, and specifications.

40. Chesapeake controls Parks' and the other Patient Care Employees' rates and methods of pay, schedules, and assignments.

41. Without the patient care work Parks and the Patient Care Employees perform, Chesapeake would not be able to complete its business objective of operating hospitals and related medical facilities.

42. Thus, Parks' and the Patient Care Employees' work is integral to Chesapeake's business objectives.

---

[2] https://chesapeakeregional.com/careers (last visited September 2, 2025).

43. In sum, Chesapeake employs Parks and the other Patient Care Employees at the hospitals and/or other facilities it owns and operates, subject to the same or similar policies, procedures, and expectations.

44. Chesapeake uniformly classifies Parks and the Patient Care Employees as non-exempt and pays them by the hour.

45. While job titles and duties may differ, Chesapeake subjects them to the same or similar policies for similar work.

46. For example, Parks worked for Chesapeake as an RN in its Chesapeake Regional Medical Center from approximately June 2023 until June 2024.

47. Parks' job duties included monitoring patient vital signs, passing medication, placing IVs, performing bloodwork, charting treatments, and other patient care duties, in accordance with the direction of doctors and other supervising medical staff.

48. Parks typically worked approximately 12 hours a day "on the clock" for 3 to 6 days a week (36 to 72 hours a workweek).

49. Chesapeake paid him approximately $45 an hour.

50. Throughout his employment, Chesapeake subjected Parks to its auto-deduction policy, deducting 30 minutes each workday for so called "meal periods."

51. But throughout his employment, Parks did not actually receive *bona fide* meal breaks.

52. Parks and the Patient Care Employees perform their jobs under Chesapeake's supervision and use materials, equipment, and technology Chesapeake approves and supplies.

53. Chesapeake requires Parks and the Patient Care Employees to follow and abide by common work, time, pay, "meal period," and overtime policies and procedures in the performance of their jobs.

54. At the end of each pay period, Parks and the Patient Care Employees receive wages from Chesapeake that are determined by common systems and methods that Chesapeake selects and controls.

55. Chesapeake requires Parks and the Patient Care Employees to record their "on the clock" hours worked using Chesapeake's timekeeping system.

56. Like Parks, the other Patient Care Employees typically work approximately 12 hours a day for 3 to 6 days a week (36-72 hours a workweek).

57. Chesapeake subjects Parks and the Patient Care Employees to its common auto-deduction policy.

58. Specifically, Chesapeake automatically deducts 30 minutes a workday from Parks' and the other Patient Care Employees' recorded hours and wages for so called "meal periods."

59. Chesapeake automatically deducts this time regardless of whether Parks and the Patient Care Employees actually receive full, uninterrupted, 30-minute meal breaks.

60. Chesapeake simply assumes Parks and the Patient Care Employees receive *bona fide* meal breaks each shift they work.

61. But Parks and the Patient Care Employees do not actually receive *bona fide* meal breaks.

62. Instead, Chesapeake requires Parks and the Patient Care Employees to remain on duty and perform compensable work throughout their shifts for Chesapeake's predominant benefit, including during their "meal periods."

63. And Chesapeake subjects Parks and the Patient Care Employees to work interruptions during their unpaid "meal periods."

64. For example, Parks remained responsible for caring for patients under his supervision during his so called "meal periods," which prevented him from utilizing his "meal periods" for his own purposes.

65. Thus, Parks and the Patient Care Employees are not free to engage in personal activities during their unpaid "meal periods."

66. Rather, during their unpaid "meal periods," Parks and the Patient Care Employees are forced to substantially perform their regular job duties and responsibilities.

67. Thus, Parks and the Patient Care Employees routinely spend their unpaid "meal breaks" performing work for Chesapeake's—not these employees'—predominant benefit.

68. This unpaid time is compensable under the FLSA and Virginia law because Chesapeake knew, or should have known, that (1) Parks and the Patient Care Employees were performing unpaid work during their "meal periods," (2) they were interrupted with work duties during any attempted "meal period," (3) they were not completely relieved of all duties during their "meal periods," (4) they entirely skipped the "meal period" due to work demands, (5) the "meal period" was less than 20 consecutive minutes, (6) they were not free to engage in personal activities during their "meal periods" because of work interruptions, (7) they remained on Chesapeake's premises or under Chesapeake's supervision, and/or (8) they spent their unpaid "meal periods" substantially performing their regular patient care duties for Chesapeake's predominant benefit.

69. Chesapeake fails to exercise its duty as Parks' and the Patient Care Employees' employer to ensure these employees are not performing work that Chesapeake does not want performed during their unpaid "meal periods."

70. And Chesapeake knows Parks and the other Patient Care Employees routinely perform work "off the clock" during their unpaid "meal periods" because Chesapeake expects and requires them to do so.

71. Parks and the other Patient Care Employees have complained to Chesapeake's management and their supervisors about being forced to work during their unpaid "meal periods."

72. Thus, Chesapeake required, requested, suffered, or permitted Parks and the Patient Care Employees to work during their unpaid "meal periods."

73. Despite accepting the benefits, Chesapeake does not pay Parks and the Patient Care Employees for the compensable work they perform during their automatically deducted "meal periods."

74. Thus, under Chesapeake's auto-deduction policy, Parks and the Patient Care Employees are denied overtime pay for on duty "meal periods" during workweeks in which they work more than 40 hours.

75. In addition to deducting from these employees' wages for so called "meal periods," Chesapeake also subjects Parks and the Patient Care Employees to its rounding policy.

76. Specifically, Chesapeake automatically rounds Parks' and the other Patient Care Employees' clock in and clock out punches to the nearest quarter hour for Chesapeake's—not the employees'—primary benefit.

77. And Chesapeake prohibits Parks and the other Patient Care Employees from clocking in for their shifts more than 7.5 minutes before their shift start times and clocking out more than 7.5 minutes after their shift end times.

78. Chesapeake considers Parks and the other Patient Care Employees tardy and takes disciplinary action or threatens to do so if they clock in even a minute past their scheduled start time or clock out even a minute before their scheduled end time.

79. Likewise, Chesapeake takes disciplinary action or threatens to do so if they clock in more than 7.5 minutes prior to their scheduled start time or clock out more than 7.5 minutes after their scheduled end time.

80. Chesapeake further requires and expects Parks and the other Patient Care Employees to perform their normal job duties immediately upon clocking in, such as charting and participating in hand-off meetings.

81. By enforcing these policies, Chesapeake ensures its rounding policy benefits Chesapeake—and does not benefit Parks and the other Patient Care Employees.

82. Thus, under Chesapeake's rounding policy, Parks and the other Patient Care Employees are denied wages for all hours worked, and overtime wages for all overtime hours worked during workweeks in which they work more than 40 hours.

83. When Parks and the Patient Care Employees work more than 40 hours in a workweek, Chesapeake does not pay them overtime wages for all overtime hours worked because Chesapeake fails to include time these employees worked "off the clock" during their unpaid "meal periods" and due to its rounding policy.

84. Finally, throughout their employment, Chesapeake has not paid Parks and the other Patient Care Employees at the required premium rates for overtime hours worked in excess of 40 in a workweek.

85. Instead, Chesapeake pays Parks and the other Patient Care Employees under its bonus pay scheme.

86. Specifically, Chesapeake agrees to pay and subsequently pays Parks and the other Patient Care Employees non-discretionary bonuses, including sign on bonuses, that it fails to include in these employees' regular rates of pay for overtime purposes.

87. Thus, under Chesapeake's bonus pay scheme, it does not pay Parks and the other Patient Care Employees overtime wages at the required rate—based on all remuneration—for all hours they work in excess of 40 in a workweek.

88. The Patient Employees are thus uniformly subject to the same or similar unlawful policies—Chesapeake's auto deduction policy, rounding policy, and bonus pay scheme—for similar work, in willful violation of the FLSA and Virginia law.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

89. Parks brings his claims as a class and collective action on behalf of himself and the other Patient Care Employees.

90. The Patient Care Employees were victimized by Chesapeake's auto-deduction policy, rounding policy, and/or bonus pay scheme.

91. Other Patient Care Employees worked with Parks and indicated they were paid in the same manner, performed similar work, and were subject to Chesapeake's same or similar auto-deduction policy, rounding policy, and bonus pay scheme.

92. Based on his experience with Chesapeake, Parks is aware Chesapeake's auto-deduction policy, rounding policy, and bonus pay scheme were imposed on other Patient Care Employees.

93. The Patient Care Employees are similarly situated in the most relevant respects.

94. Even if their job duties and locations vary, these differences do not matter for the purpose of determining their entitlement to overtime.

95. Therefore, the specific job titles or locations of the Patient Care Employees do not prevent class or collective treatment.

96. Rather, the putative collective is held together by Chesapeake's auto-deduction policy, rounding policy, and bonus pay scheme, which systematically deprives Parks and the Patient Care Employees of overtime wages for hours worked in excess of 40 in a workweek.

97. Chesapeake's failure to pay overtime wages as required by the FLSA and VOWA results from generally applicable, systematic policies and practices not dependent on the personal circumstances of the Patient Care Employees.

98. Chesapeake's records reflect the number of hours the Patient Care Employees recorded working each week.

99. Chesapeake's records also show that it automatically deducted 30 minutes a day from the Patient Care Employees' recorded work time for "meal periods."

100. Likewise, Chesapeake's records show the specific time the Patient Care Employees punched in and out for shifts.

101. And Chesapeake's records also show that it automatically rounded the Patient Care Employees recorded time punches to the nearest quarter hour.

102. Chesapeake's records also show it paid the Patient Care Employees non-discretionary bonuses.

103. The back wages owed to Parks and the other Patient Care Employees can therefore be calculated using the same formula applied to the same records.

104. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Chesapeake's records, and there is no detraction from the common nucleus of liability facts.

105. Therefore, the issue of damages does not preclude class or collective treatment.

106. Parks' experiences are typical of the experiences of the other Patient Care Employees.

107. Parks has no interest contrary to, or in conflict with, the Patient Care Employees.

108. Parks has an interest in obtaining the unpaid wages owed to the Patient Care Employees under federal and Virginia law.

109. A class and collective action, such as the instant one, is superior to other available means for fair and efficient adjudication of this lawsuit.

110. Absent this class and collective action, many Patient Care Employees likely will not obtain redress for their injuries, and Chesapeake will reap the unjust benefits of violating the FLSA and Virginia law.

111. Further, even if some of the Patient Care Employees could afford individual litigation against Chesapeake, it would be unduly burdensome to the judicial system.

112. Concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Patient Care Employees' claims.

113. The questions of law and fact that are common to each Patient Care Employee predominate over any questions affecting solely the individual members.

114. Among the common questions of law and fact are:

a. Whether Chesapeake engaged in a policy and practice of automatic 30-minute deductions for "meal periods" that were not *bona fide*, continuous, and uninterrupted;

b. Whether Chesapeake's auto-deduction policy deprived Parks and the other Patient Care Employees of wages for time worked during meal periods that were not *bona fide*, continuous, and uninterrupted;

c. Whether Chesapeake knew, or had reason to know, Parks and the Patient Care Employees were requested, suffered, permitted, or allowed to work "off the clock" during their unpaid "meal periods";

d. Whether Chesapeake's rounding policy deprived Parks and the other Patient Care Employees of wages for time worked;

e. Whether Chesapeake failed to pay Parks and the other Patient Care Employees overtime wages for all hours worked after 40 in a workweek, including those worked "off the clock";

f. Whether Chesapeake paid the Patient Care Employees non-discretionary bonuses;

g. Whether Chesapeake engaged in a policy or practice of failing to include non-discretionary bonuses in the Patient Care Employees' regular rates of pay for the purpose of calculating overtime;

h. Whether Chesapeake failed to pay the Patient Care Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

i. Whether Chesapeake's decision not to pay Parks and the Patient Care Employees overtime wages for all overtime hours worked was made in good faith; and

j. Whether Chesapeake's violations were willful.

115. There are many similarly situated Patient Care Employees who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

116. This notice should be sent to the Patient Care Employees pursuant to 29 U.S.C. § 216(b).

117. Those similarly situated employees are known to Chesapeake, are readily identifiable, and can be located through Chesapeake's business and personnel records.

## CHESAPEAKE'S VIOLATIONS WERE WILLFUL

118. Chesapeake knew it was subject to the FLSA's and VOWA's overtime provisions.

119. Chesapeake knew the FLSA and VOWA required it to pay employees, including the Patient Care Employees, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek.

120. Chesapeake knew the Patient Care Employees were non-exempt employees entitled to overtime pay.

121. Chesapeake knew the Patient Care Employees were paid by the hour.

122. Chesapeake knew each Patient Care Employees worked over 40 hours in at least one workweek during the three years before this Complaint was filed because Chesapeake required these employees to record their "on the clock" hours using its timekeeping system.

123. Chesapeake knew the FLSA and VOWA required it to pay employees, including the Patient Care Employees, for all hours these employees performed compensable work.

124. Chesapeake knew that, as the Patient Care Employees' employer, it had a duty to ensure these employees were not performing work "off the clock" (without pay) that Chesapeake did not want performed.

125. Chesapeake knew it failed to provide the Patient Care Employees with *bona fide*, uninterrupted meal breaks.

126. Chesapeake knew the Patient Care Employees did not actually receive *bona fide*, uninterrupted meal breaks.

127. Chesapeake knew the Patient Care Employees regularly worked during their unpaid "meal periods."

128. Chesapeake knew it required, requested, suffered, or permitted, the Patient Care Employees to work during their unpaid "meal periods."

129. Chesapeake knew the Patient Care Employees regularly spent their unpaid "meal periods" substantially performing their regular job duties for Chesapeake's predominant benefit.

130. Indeed, Patient Care Employees complained to Chesapeake's management, HR, and/or their supervisors about being forced to work during their unpaid "meal periods."

131. Thus, Chesapeake knew, should have known, or recklessly disregarded the fact that the Patient Care Employees performed compensable work during their unpaid meal breaks.

132. Nonetheless, Chesapeake automatically deducted 30 minutes a day from the Patient Care Employees' recorded work time for "meal periods."

133. In other words, Chesapeake knew, should have known, or recklessly disregarded the fact that it did not pay the Patient Care Employees for all the hours they performed compensable work.

134. Chesapeake knew it rounded the Patient Care Employees clock in and clock out punches to the nearest quarter hour.

135. Chesapeake knew it required the Patient Care Employees to clock in and out within 7.5 minutes of their scheduled shift start and end times, under threat of disciplinary action.

136. Chesapeake knew this ensured the Patient Care Employees' hours would be rounded to the nearest quarter hour for Chesapeake's primary benefit and to the detriment of the Patient Care Employees.

137. Chesapeake knew it paid Parks and the other Patient Care Employees non-discretionary bonuses, including sign on bonuses.

138. Chesapeake knew these non-discretionary bonuses were not included in Parks' and the other Patient Care Employees' regular rates of pay for the purpose of calculating their overtime rates of pay.

139. And Chesapeake knew the FLSA and VOWA required it to pay Parks and the other Patient Care Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

140. Chesapeake knew the VWPA requires employers, like Chesapeake, to pay employees, including Parks and the other Virginia Class Members, for all the hours of work they perform at the rate(s) agreed to by the parties on their regular paydays.

141. Chesapeake's decision to automatically deduct 30 minutes a day from the Patient Care Employees' recorded work time for "meal periods" was neither reasonable, nor was this decision made in good faith.

142. Chesapeake's decision to round the Patient Care Employees' recorded work time to the nearest quarter hour for its benefit and their detriment under its rounding policy was neither reasonable, nor was this decision made in good faith.

143. Chesapeake's decision to exclude non-discretionary bonuses from the Patient Care Employees' regular rates of pay was neither reasonable, nor was this decision made in good faith.

144. Chesapeake's failure to pay the Patient Care Employees overtime wages for all overtime hours worked at the required rate—based on all remuneration—was neither reasonable, nor was it made in good faith.

145. Chesapeake knowingly, willfully, and/or in reckless disregard carried out these illegal policies that deprived Parks and the Patient Care Employees of overtime wages at the required rates for all hours worked after 40 in a workweek and earned wages in violation of the FLSA and Virginia law.

146. Indeed, Chesapeake has previously been sued for failing to pay wages and overtime wages in accordance with the FLSA. *See Liptak, et al. v. Chesapeake Hospital Authority*, Case No. 2:95-cv-01123-JAM (E.D. Va.).

147. Chesapeake knew, should have known, or recklessly disregarded whether the conduct described in this Complaint violated the FLSA and Virginia law.

## COUNT I
## FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA
## (FLSA COLLECTIVE)

148. Parks brings his FLSA claim on behalf of himself and the Patient Care Employees pursuant to 29 U.S.C. § 216(b).

149. Chesapeake violated, and is violating, the FLSA by employing non-exempt employees (Parks and the Patient Care Employees) in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek, including those worked during their unpaid "meal periods."

150. Chesapeake's unlawful conduct harmed Parks and the Patient Care Employees by depriving them of the overtime wages they are owed.

151. Accordingly, Parks and the Patient Care Employees are entitled to recover the difference between the wages actually paid and the overtime wages actually earned under the FLSA in an amount equal to 1.5 times their regular rates of pay, plus an equal amount as liquidated damages, as well as attorney's fees and costs.

## COUNT II
## FAILURE TO PAY OVERTIME WAGES UNDER THE VOWA
## (VIRGINIA CLASS)

152. Parks brings his VOWA overtime claim on behalf of himself and the other Virginia Class Members pursuant to FED. R. CIV. P. 23.

153. Chesapeake's conduct violates the VOWA. *See* VA. CODE § 40.1-29.2.

154. At all relevant times, Chesapeake was subject to the VOWA because Chesapeake was (and is) an "employer" within the meaning of the VOWA.

155. At all relevant times, Chesapeake employed Parks and the other Virginia Class Members as its covered "employees" within the meaning of the VOWA.

156. Parks and the other Virginia Class Members are non-exempt employees entitled to overtime wages under the VOWA.

157. The VOWA requires employers, like Chesapeake, to pay non-exempt employees, including Parks and the other Virginia Class Members, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek. VA. CODE § 40.1-29.2.

158. Chesapeake knowingly violated, and is violating, the VOWA by failing to pay Parks and the other Virginia Class Members overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek.

159. Chesapeake's unlawful conduct harmed Parks and the other Virginia Class Members by depriving them of the overtime wages they are owed.

160. Accordingly, Chesapeake owes Parks and the other Virginia Class Members the overtime wages at 1.5 times their regular rates for all hours worked over 40 in a workweek, plus an additional amount as liquidated damages. VA. CODE §§ 40.1-29(J) and 40.1-29.2.

161. Finally, Parks and the other Virginia Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action. VA. CODE § 40.1-29(J).

## COUNT III
## FAILURE TO PAY ALL WAGES EARNED UNDER THE VWPA
## (VIRGINIA CLASS)

162. Parks brings his VWPA claim on behalf of himself and the other Virginia Class Members pursuant to FED. R. CIV. P. 23.

163. Chesapeake's conduct violates the VWPA (VA. CODE § 40.1-29).

164. At all relevant times, Chesapeake was subject to the VWPA because Chesapeake was (and is) an "employer" within the meaning of the VWPA.

165. At all relevant times, Chesapeake employed Parks and the other Virginia Class Members as its covered "employees" within the meaning of the VWPA.

166. The VWPA requires employers, like Chesapeake, to pay employees, including Parks and the other Virginia Class Members, for all the hours of work they perform at the rate(s) agreed to by the parties on their regular, established paydays. VA. CODE § 40.1-29.

167. During the course of their employment, Chesapeake agreed to pay Parks and each Virginia Class Member an hourly rate for all the hours of work they performed.

168. Parks and each Virginia Class Member accepted Chesapeake's offer.

169. But during the course of their employment, Chesapeake failed to pay Parks and the other Virginia Class Members for all the time they worked at the rates Chesapeake agreed to pay them because Chesapeake failed to include the time they worked "off the clock" before and after their shifts due to Chesapeake's rounding policy and during their "meal periods."

170. Thus, Chesapeake knowingly violated, and is violating, the VWPA by failing to pay Parks and the other Virginia Class Members all their earned wages (at the rates Chesapeake agreed to pay them) for all the hours of work they performed for Chesapeake's predominant benefit.

171. Chesapeake's unlawful conduct harmed Parks and the other Virginia Class Members by depriving them of the earned wages they are owed.

172. Accordingly, Chesapeake owes Parks and the other Virginia Class Members their unpaid earned wages (at their agreed hourly rates), plus an equal amount as liquidated damages. VA. CODE § 40.1-29(J).

173. Finally, Parks and the other Virginia Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action. VA. CODE § 40.1-29(J).

## JURY DEMAND

174. Parks demands a trial by jury on all counts.

## RELIEF SOUGHT

WHEREFORE, Parks, individually and on behalf of the Patient Care Employees, seeks the

following relief:

a. An Order designating this lawsuit as a collective action and permitting the issuance of a notice pursuant to 29 U.S.C. § 216(b) to all Patient Care Employees with instructions to permit them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

b. An Order certifying a class action pursuant to FED. R. CIV. P. 23;

c. An Order appointing Parks and his counsel to represent the interests of the Patient Care Employees;

d. An Order finding Chesapeake liable to Parks and the other FLSA Collective Members for all unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

e. An Order finding Chesapeake liable to Parks and the other Virginia Class Members for all their unpaid overtime wages owed under the VOWA plus liquidated damages;

f. An Order finding Chesapeake liable to Parks and the other Virginia Class Members for all their unpaid earned wages owed under the VWPA plus liquidated damages;

g. Judgment awarding Parks and the other Patient Care Employees all unpaid earned wages, unpaid overtime wages, liquidated damages, treble damages, statutory damages, and any other penalties available under the FLSA, VOWA, and/or VWPA;

h. An Order awarding attorney's fees, costs, and expenses to the Patient Care Employees;

i. Pre- and post-judgment interest at the highest applicable rates; and

j. Such other and further relief as may be necessary and appropriate.

Dated: September 18, 2025

Respectfully submitted,

**BUTLER CURWOOD, PLC**

By: */s/ Zev H. Antell*
Harris D. Butler, III VSB No. 26483
Craig J. Curwood VSB No. 43975
Zev H. Antell VSB No. 74634
140 Virginia Street, Suite 302
Richmond, VA 23219
Phone: (804) 648-4848
Fax: (804) 237-0413
harris@butlercurwood.com
craig@butlercurwood.com
zev@butlercurwood.com

Michael A. Josephson*
Andrew W. Dunlap*
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
**BRUCKNER BURCH, PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

**Pro hac vice applications forthcoming*

**ATTORNEYS FOR PARKS &**
**THE PATIENT CARE EMPLOYEES**